IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
FILED
FEB -5 2016
CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

Vir2us, Inc.,

        **Plaintiff and Counterclaim Defendant,**

v.                                                                                   Civil Action No. 2:15cv162

Invincea, Inc. and
Invincea Labs, LLC,

        **Defendants and Counterclaim Plaintiffs.**

## OPINION AND ORDER

On Monday, February 1, 2016, the Court conducted a <u>Markman</u> hearing for the purpose of construing ten (10) disputed terms in the patents at issue. Upon consideration of the parties' briefs and oral arguments, the Court ruled from the bench as to nine (9) of these terms and took the construction of one (1) term under advisement. The Court hereby issues this Opinion and Order further detailing the Court's claim construction.

### I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

On April 15, 2015, Plaintiff Vir2us, Inc. ("Plaintiff" or "Vir2us") filed a two-count Complaint, alleging that Defendants Invincea, Inc. and Invincea Labs, LLC ("Defendants" or "Invincea") have infringed U.S. Patent Nos. 7,392,541 ("the '541 Patent") and 7,536,598 ("the '598 Patent"). Doc. 1. Essentially, Plaintiff alleges that Defendants are infringing certain claims in the '541 and '598 Patents by, for example, "inducing third parties, including without limitation, manufacturers, resellers, developers, customers, and end users" directly to infringe the claims of the '541 Patent "by installing the Invincea Accused Products on computing devices[,] using the Invincea Accused Products in their normal and customary manner," and providing

"technical and marketing literature, tutorials, presentations, lectures, product demonstrations, and videos to customers and end users on how to install, operate configure, and use" certain of Defendants' products. Compl. ¶¶ 14, 18. Vir2us alleges similar claims of infringement pertaining to the '598 Patent. See Compl. ¶¶ 26, 27. Defendants filed their answer on June 12, 2015, Doc. 17, denying they infringed on the patents at issue. See Answer ¶ 1. Additionally, Defendants asserted the affirmative defenses of Failure to State a Claim, Non-Infringement, Invalidity, Prosecution History Estoppel, Limitation on Damages, No Right to Injunctive Relief, Laches, Equitable Estoppel and Waiver, 28 U.S.C. § 1498(a). Answer ¶¶ 34–44.

Defendants also alleged counterclaims against Vir2us, asserting that Plaintiff has infringed U.S. Patent No. 8,839,422 ("the '422 Patent") by "making, using, offering to sell, and/or selling in the United States, without authority, products including without limitation Vir2us's software, including Vir2us Immunity Suite, Vir2us Immunity Platform and/or Vir2us Genesis." Answer ¶ 59. Defendants also seek a declaration that they did not infring any claim of the '541 Patent or the '598 Patent. Answer ¶¶ 67, 72. Defendants' counterclaim also alleges that one or more claims of the '541 or '598 Patents are invalid. Answer ¶¶ 76, 80. On July 2, 2015, Vir2us responded to Invincea's counterclaims, denying infringement and willful infringement of the '422 Patent. Doc. 21 ¶ 61. Vir2us asserted the affirmative defenses of Patent Invalidity, Non-Infringement, Prosecution Disclaimer and Prosecution History Estoppel, Limitation of Damages, No Right to Injunctive Relief, and Lack of Standing. Doc. 21 ¶¶ 82–87.

On September 23, 2015, the Court entered its Rule 16(b) Scheduling Order. Doc. 24. The parties filed their Joint Identification of Patent Claims and Disputed Claim Terms on December 18, 2015, Doc. 47, after the Court held a hearing to address Vir2us's Emergency Motion to Strike Invincea's Identification of Claim Terms for Failure to Comply with the Court's

Scheduling Order, Doc. 34. The parties filed their opening claim construction briefs on December 23, 2015. Docs. 48, 51. On January 11, 2016, the parties filed their responsive briefs. Doc. 57, 58. On January 18, 2016, the parties filed a Joint Claim Construction and Prehearing Statement, in which they outlined the terms to be construed at the hearing. Doc. 61.

## II. LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

### A. General Principles

The purpose of a Markman hearing is to assist the Court in construing the meaning of the patent(s) at issue. Markman v. Westview Instruments, Inc., 517 U.S. 370, 371 (1996); Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). Patents consist of "claims," and the construction of those claims "is a question of law, to be determined by the court." Markman, 517 U.S. at 371; Markman, 52 F.3d at 970–71. A court need only construe, however, claims "that are in controversy, and only to the extent necessary to resolve the controversy." Vivid Techs., Inc. v. Am. Science Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (citations omitted). To be clear, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1311 (Fed. Cir. 2005) (citing U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Claim construction begins with the words of the claims. Vitronics Corp. v. Conceptromc, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves . . . ."). Words in a claim are generally given their ordinary meaning as understood by a person of ordinary skill in the art (a "POSITA"). Id. This "person of ordinary skill in the art is deemed to read the claim term not only in the particular claim in which the disputed term appears but also

in the context of the entire patent, including the specification." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "In some cases, . . . the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words." Id. at 1314. Often, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claims language to mean." Id.

Further, the claims themselves can provide substantial guidance as to the meaning of particular claim terms. Id. First, "the context in which a term is used within a claim can be highly instructive." Id. In addition, other claims of the patent in question, both asserted and unasserted, can also be useful because claim terms are "normally used consistently throughout the patent" and therefore "can often illuminate the meaning of the same term in other claims." Id.

The claims should not be read alone, however, but rather should be considered within the context of the specification of which they are a part. Markman, 52 F.3d at 978. As the Federal Circuit stated in Vitronics and restated in Phillips, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315. The Court, however, must not read in limitations from the specification without clear intent to do so. Thorner v. Sony Comp. Entmt. Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Furthermore, a patentee is free to be his or her

own lexicographer, and thus if the patentee defines a term in the specification differently than its ordinary meaning, the patentee's definition controls. Phillips, 415 F.3d at 1316.

In addition to consulting the specification, a court may also consider the patent's prosecution history, if in evidence, because it provides information regarding how the United States Patent and Trademark Office and the inventor understood the patent. See id. at 1317. It also enables the Court to determine if the inventor limited the invention during the course of prosecution. Id. "[W]here an applicant whose claim is rejected on reference to a prior patent ... voluntarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he may not by construction ... give the claim the larger scope which it might have had without the amendments." I.T.S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 444 (1926). Thus, consulting prior art reference in the prosecution history is permissible. Vitronics, 90 F.3d at 1583.

These elements of the patent itself—the claims, the specification, and its prosecution history—constitute intrinsic evidence of claim construction. In addition to such intrinsic evidence, a court may consider extrinsic evidence to determine the meaning of disputed claims. Phillips, 415 F.3d at 1317. Such extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (citing Markman, 52 F.3d at 980). However, the Court should not rely on extrinsic evidence when the intrinsic evidence removes all ambiguity. Vitronics, 90 F.3d at 1583.

Such extrinsic evidence generally is held as less reliable than the intrinsic evidence and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." Id. at 1317–18. With respect to expert evidence, for example,

5

"[c]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court . . . [and] a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." Id. at 1318.

With respect to general usage dictionaries, the Federal Circuit noted that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used . . . in claim construction," and further noted that "a dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" Id. at 1322 (citing Vitronics, 90 F.3d at 1585). However, the Federal Circuit cautions that (1) "'a general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term;" that (2) "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent;" and that (3) "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d 1322 (quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)).[1] Indeed, "different dictionary definitions may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor, . . . uninformed by the specification, to rely on one dictionary rather than another." Id.

---

[1] In Phillips, the Federal Circuit thus expressly discounted the approach taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F. 3d 1193 (Fed. Cir. 2002), in which the court placed greater emphasis on dictionary definitions of claim terms. Phillips, 415 F.3d at 1319–24 ("Although the concern expressed by the court in Texas Digital was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."). The Federal Circuit reaffirmed the approach in Vitronics, Markman, and Innova as the proper approach for district courts to follow in claim construction, but acknowledged that there was "no magic formula" for claim construction, and that a court is not "barred from considering any particular sources . . . as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Phillips, 415 F.3d at 1324.

**B. The "Canons of Claim Construction"**

The Federal Circuit has recognized certain guideposts, or "canons of construction," to assist a district court in determining the meaning of disputed claim terms and phrases. These are merely guideposts, however, and are not immutable rules:[2]

1. Doctrine of Claim Differentiation: Ordinarily, each claim in a patent has a different scope. See, e.g., Versa Corp. v. Ag-Bag Int't Ltd., 392 F.3d 1325, 1330 (Fed. Cir. 2004). Ordinarily, a dependent claim has a narrower scope than the claim from which it depends. See, e.g., Phillips, 415 F.3d at 1315. Ordinarily, an independent claim has a broader scope than a claim that depends from it. See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1351 (Fed. Cir. 2005).

2. Ordinarily, claims are not limited to the preferred embodiment disclosed in the specification. See, e.g., Phillips, 415 F.3d at 1323.

3. Ordinarily, different words in a patent have different meanings. See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1119–20 (Fed. Cir. 2004).

4. Ordinarily, the same word in a patent has the same meaning. See, e.g., Phillips, 415 F.3d at 1314.

5. Ordinarily, the meaning should align with the purpose of the patented invention. See, e.g., Innovad Inc. v. Microsoft Corp., 260 F.3d 1326, 1332–33 (Fed. Cir. 2001).

6. Ordinarily, general descriptive terms are given their full meaning. See, e.g., Innova/Pure Water, Inc., 381 F.3d at 1118.

7. If possible, claims should be construed so as to preserve their validity. See, e.g., Energizer Holdings, Inc. v. Int'l Trade Comm'n, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006).

8. Ordinarily, absent broadening language, numerical ranges are construed exactly as written. See, e.g., Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1381 (Fed. Cir. 2000).

9. Ordinarily, absent recitation of order, steps of a method are not construed to have a particular order. See, e.g., Combined Sys., Inc. v. Def. Tech. Corp. of Am., 350 F.3d 1207, 1211–12 (Fed. Cir. 2003).

---

[2] This list is derived from the one provided in the FEDERAL JUDICIAL CENTER, PATENT LAW AND PRACTICE § 5.I.A.3.d (5th ed. 2006).

7

10. Absent highly persuasive evidentiary support, a construction should literally read on the preferred embodiment. See, e.g., Cytologix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1175 (Fed. Cir. 2005).

### III. DISPUTED TERMS

The parties dispute the following terms. The Court stated on the record the reasons for its constructions, and it now explains its reasoning in greater detail.

**a. "processing logic device"**

The Court **ORDERED** that the proper construction of "processing logic device" is **"hardware circuitry capable of executing electronic instructions."**

This construction was proposed by Invincea. At the hearing, Vir2us did not dispute that the term is anything other than hardware. Instead, Vir2us argued that Invincea's proposed construction contained extraneous information, that the term was readily understood, and that if the Court were to construe the term, it should adopt Vir2us's proposed construction, "computer processing circuitry." The Court, however, found that Invincea's proposed instruction did not contain extraneous information.

The Court began by examining the patent language. See Vitronics Corp., 90 F.3d at 1582. Claim One of the '541 Patent refers to "at least one processing logic device for executing at least one instruction . . ." '541 Patent, 69:10–12. Invincea's proposal incorporates concepts present in the patent language and the specification, which both support the idea that a "processing logic device" is "hardware circuitry capable of executing electronic instructions." See, e.g., '541 Patent, 47:18–24 (noting that isolated computing environments ("ICE") "will normally include processing logic for executing the set of instructions intended of the ICE and storage switchably coupleable and decoupleable with the processing logic."). Additionally, Vir2us's proposed construction is circular, defining a "processing logic device" as "computer

8

processing circuitry." To avoid jury confusion, the Court adopted Invincea's construction, which explicitly states that the "processing logic device" is hardware circuitry that can execute instructions.

**b. "microprocessor"**

After considering the parties' submissions and arguments, the Court **ORDERED** that this term required no further construction. The Court is not required to construe every disputed term. See 02 Micro Intern. Ltd. v. Beyond Innovation Technology Co. Ltd., 521 F.3d 1351, 1362 (Fed. Cir. 2008); see also Sunbeam Products, Inc. v. Hamilton Beach Brands, Inc., et al., 3:09-cv-791, 2010 WL 3291830 (E.D. Va. Aug. 19, 2010). The patent does not define "microprocessor." However, the term possesses a plain and ordinary meaning and its meaning is readily apparent to a person of ordinary skill in the art. Indeed, Invincea, the party requesting the Court to construe this term, admitted that the patent "applies [microprocessor] consistently with well-known industry usage." Doc. 51 at 10. Therefore, the Court need not construe this term.

**c. "data store," "storage," "data storage"**

The Court **ORDERED** that the proper construction of these terms is **"separate areas of memory to store data."** The parties agreed that these terms refer to areas or portions of memory. They also agreed that although these terms are slightly different, they should all have the same construction. The parties disagreed, however, as to whether data storage can be based on hardware, software, or both, and they disagreed as to whether data storages are separate from each other.

The Court examined the '541 and '598 patent languages and specifications, which note that "data storage devices can consist of hardware, and/or software, and/or a combination of both." '598 Patent at 64:2–4. Since the Court should not read limitations into the claims that are

not there, see Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1371 (Fed. Cir. 2014), it would be improper to limit these terms to only physical devices, as Defendants' construction proposes. Additionally, the patents also describe a first data storage and a second data storage, which are different, or separate. See '598 Patent, Claim 66 at 90:20–33; '541 Patent, Claim 1 at 69:13–16. The Court disagrees with Vir2us that specifying that the data storages are separate is redundant, because it is necessary to inform the jury that these storages cannot overlap. Therefore, the Court finds that defining these terms as "separate areas of memory to store data" accurately describes their function and will assist the jury.

### d. "data store switch"

The Court **ORDERED** that the proper construction of this term is **"software, or hardware, or a combination of the two that controls access to a data store."** Like the disagreements over data store, storage, and data storage, the parties disputed whether this term should be limited to physical devices. Invincea argued that that while the act of switching may be logical, the switch itself is physical. The patent specification, however, states that "[t]he switching of a data store may be logical or physical. Logical switching is switching enforced purely by software." '598 Patent at 7:11–12. It also states that "data storage devices can consist of hardware, and/or software, and/or a combination of both." '598 Patent at 64:2–4. Thus, the switch may be non-physical. The Court notes that the word "switch" is given a different meaning in computer speak. It no longer represents only a physical object that someone must touch to perform a function. The Court agrees with Vir2us that by attempting to limit construction of this term to a physical device, Invincea improperly limits the scope of the term. See Hill-Rom Servs., 755 F.3d at 1371. Thus, it is necessary for the Court to construe the term and to specify that a data store switch can be software, hardware, or a combination of the two.

### e. "couple" / "decouple" / "coupling" / "decoupling" / "coupled" / "coupleable"

The Court **ORDERED** that the proper construction of the terms "couple," "coupling," "coupleable," and "coupled" is **"hardware, or software, or a combination of the two that allows for communication of information."** The Court **ORDERED** that the proper construction of the terms "decouple" and "decoupling" is **"hardware, or software, or a combination of the two that disallows for communication of information."** The Court construed the terms in this manner to be consistent with its construction of "switch." The Court examined the patent languages and the specifications to conclude that coupling and decoupling can be performed by software, or hardware, or a combination of the two. See '541 Patent at 47:65–48:6 ("any device, logic, hardware, or software that either physically or logically couples or decouples a signal . . ."). The Court rejected Invincea's argument that excluding the word "power" from the construction would omit electrical coupling, because the Court viewed incorporating the words "power" or "electrical coupling" as redundant. Indeed, the patents modify "couple" and its variants with "communicatively" and "electrically." See, e.g., '541 Patent at 6:67; '598 Patent at 11:65, 13:18, 14:22–25, 15:4. The fact that "communicatively" and "electronically" modify "couple" suggests that the term "couple" does not inherently mean hardware, software, or a combination of the two that allows for communication, communicatively or electronically. Cf. Phillips, 415 F.3d at 1314 (noting that because the claim at issue referred to "steel baffles," the claim "strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Therefore, there is no additional need to specify that power, as well as information, may be coupled.

Additionally, Invincea stressed during the hearing that the data stores do not necessarily cease to exist after decoupling. This construction, however, does not equate decoupling with

destroying. What occurs after decoupling, and whether or not the data storages continue to exist or cease to exist when decoupled, is a separate issue.

### f. "dynamically configurable"

The Court **ORDERED** that the proper construction of "dynamically configurable" is **"the configuration can be changed during operation."** The parties disputed whether the term "dynamically configurable" is necessarily limited to physical components. The Court did not agree with Invincea that the term is limited to only physical components. See, '541 Patent at 6:31–34, 6:37–39, 29:16–33, 10:8–11, 47:65–48:6. Indeed, Invincea's proposal limits the dynamic configuration to only physical components, and the Court should not "read limitations from the embodiments in the specification into the claims." Hill-Rom Servs., 755 F.3d at 1371. The Court also construed this term in this way because it believed that if it did not construe the term, the jury may think that "dynamic" implied "vigorous."

### g. "switching system for selectably and independently coupling and decoupling the processing logic device with the first storage and/or the second storage under automated control"

The parties dispute whether this claim phrase is a means-plus-function element governed by 35 U.S.C. § 112(f). The Court has taken this issue under advisement.

### h. "virtual browsing environment"

The Court **ORDERED** that the proper construction of this term is **"a virtual execution environment specifically for a web browser,"** adopting Vir2us's proposed construction. The parties agreed that a "virtual browsing environment" is an execution environment, but they disagreed as to the type of application that can be executed inside of such an environment. Vir2us argued that "virtual browsing environment" is limited to a website browser application,

whereas Invincea claimed it could be used with any application, such as Microsoft Word, for example. The Court first examined the claim language, in the context of the entire patent. See Vitronics Corp., 90 F.3d at 1582; see also Phillips, 415 F.3d at 1313–14. It is important to note that "the context of the surrounding words of the claim also must be considered." ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003). Additionally, "it is the claims, not the written description, which define the scope of the patent right." Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1346 (Fed. Cir. 2015) (quoting Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998) (internal quotations omitted). Here, Claim 1 of the '422 Patent states that "the information including at least one website address and an indication of an operation of the at least one operating system when the at least one browser application executed within the at least one virtual browsing environment accessed at least one website at the at least one website address." '422 Patent, Claim 1 at 19:13–18. The claim language does not refer to any type of application but rather focuses on a browser application that accesses a website. The claim language therefore implies that the virtual browsing environment is specific to a web browswer. Thus, Invincea is improperly attempting to broaden the scope of this term. The Court notes that the specification states that a virtual browsing environment may be used with any type of application. '442 Patent at 18:4–5. While a patentee is free to define a term in the specification differently from its ordinary meaning, Phillips, 415 F.3d at 1316, here, the claim language itself is unambiguous and limits this term to a web browser. See, Chef America, Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1374–75 (Fed. Cir. 2004) (construing an unambiguous term as written). Therefore, "virtual browsing environment" should be construed as it appears in the claim language.

  **i. "collection computer"**

The Court **ORDERED** that the proper construction of this term is **"a computer connected to a separate computer through a network."** The parties disputed whether the computer must be connected over a server. The specification describes the "collection computer" receiving and sending data to and from a network. See '422 patent at Fig. 1, 2:9–14, 26–28. At the hearing, the Court suggested "a computer connected to a separate computer through a network" as the construction, and both parties agreed.

**j. "website address"**

The Court **ORDERED** that this term requires no construction. Interestingly, Invincea claims that a term in its own patent, the '422 Patent, should be defined here, and Vir2us asserts that this term has a plain and ordinary meaning. Invincea argues that this term applies to "information used to identify a server hosting a website, such as a Uniform Resource Locator ("URL") (*e.g.*, www.cnn.com) or an IP address." Doc. 51 at 23 (citing Rubin Decl. ¶ 38). It also states that "although this meaning is plain to one of ordinary skill in the art, a jury may not be aware that multiple forms of addresses can be used to access a website." Doc. 51 at 24. The Court, however, agrees with Vir2us that a "website address" is not an IP address and that a person of ordinary skill in the art would not consider an IP address a website address. The Court noted that the fact that an IP address could be a website address does not necessarily imply that a website address is an IP address. The Court also examined Newton's Telecom Dictionary, which lists a URL as an example of a web address, see Doc. 59-1, Newton's Telecom Dictionary at 764 (17th ed. 2001). The Microsoft Press Computer Dictionary defines "IP address" as "a 32-bit (4-byte) binary number that uniquely identifies a host (computer) connected to the Internet and other Internet hosts . . . [which] is expressed in "dotted quad" format . . ." Doc. 59-2, Microsoft Press Computer Dictionary at 264 (3rd ed. 1997), as does Webster's New World Dictionary,

Doc. 59-3, Webster's New World Telecom Dictionary at 250–51 (2008). The Court finds that both a person of ordinary skill in the art and a lay person would understand "website address" and that it thus needs no further construction. The Court notes that Invincea chose to use the term "website address" in its patent, and that if it wished for the term to apply to IP addresses as well as URLs, it would have so specified. The Court "construe[s] the claim as written, not as the patentees wish they had written it." Chef America, 358 F.3d at 1374.

## IV. Settlement Conference

The parties are **ORDERED** to inform the Court by noon on Friday, February 12, 2016, whether they are able to agree on a date and to schedule a private mediation. Otherwise, the Court will ask a magistrate judge to hold a settlement conference in this matter.

## V. Conclusion

For the reasons stated on the record and elaborated herein, the Court constructed the disputed terms as follows:

| Disputed Term | The Court's Construction |
|---|---|
| Processing logic device | Hardware circuitry capable of executing electronic instructions |
| Microprocessor | No further construction needed |
| Data store, storage, data storage | Separate areas of memory to store data |
| Data store switch | Software, or hardware, or a combination of the two that controls access to a data store |
| Couple, decouple, etc. | Hardware, or software, or a combination of the two that (dis)allows for communication of information |
| Dynamically configurable | The configuration can be changed during operation |
| Virtual browsing environment | A virtual execution environment specifically for a web browser |
| Collection computer | A computer connected to a separate computer through a network |
| Website address | No further construction needed |

The Clerk is **REQUESTED** to deliver a copy of this Order to all counsel of record.

It is so **ORDERED.**

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
February 4, 2016